UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JAMES H. REYELT, Plaintiff | ) | |
| | ) | C.A. No. 06-0057ML |
| v. | ) | |
| WILLIAM B. DANZELL and LOUISA F. BEENKER DANZELL, Defendants | ) | |

# PLAINTIFF'S PRETRIAL MEMORANDUM

## A. PLAINTIFF'S PROOF

Plaintiff will establish that defendants breached their obligation to initiate zoning proceedings within three months of the closing. Plaintiff will also establish that defendants breached their obligation to use good faith and diligence by failing to provide the Barrington Zoning Board of Appeals with information the Zoning Ordinance specifies is necessary to justify zoning relief. The failure to provide necessary information, the consequence of defendants' decision to minimize the cost of their zoning application, was so complete, the Chairman of the Zoning Board called defendants' zoning application "surprising and inappropriate," almost "shamelessly saying we don't have any plans but we want you to give us" the special use permit.

### The Purchase and Sale Contract

1. Plaintiff James H. Reyelt is a citizen of Florida and resides in West Palm Beach, Florida. Defendants William B. Danzell and Louisa F. Beenker Danzell are citizens of South Carolina.

2. In early July 2203, defendants offered in writing to purchase plaintiff's property at 10-12 Payne Road, Barrington, Rhode Island, for $1,425,000, and made a down

payment on the purchase. The Payne Road property is a waterfront lot in the Barrington Beach area, with a guest house near the road, a main house near the center of the property, and a freestanding garage.

3. On July 23, 2003, defendants advised plaintiff they would not purchase the Payne Road property and had put stop orders on their down payment checks, because the property "was a non-conforming use" and "would require Zoning Board approval for [them] to tear down the main house and construct a new home."

4. On August 18, 2003, defendants reversed course, and made a second $1,425,000 offer on the property, subject to an attached addendum. The addendum provided: "Buyer to pay $1,225,000 at closing, and seller to take back a one year note $200,000 … Variance needed to [sic] buyer to add on or construct new house on site. If variance is obtained, at end of one year period, buyer will repay the principle [sic] of $200,000 plus interest. If variance denied, buyer will be obligated to pay ½ of loan amount (or $100,000 plus interest)."

5. On August 28, 2003 and September 3, 2003, respectively, the defendants and plaintiff (by power of attorney) executed a Single/Multi Family Purchase and Sales Agreement (the "Agreement") with a Rider A ("Rider A"). The total listed purchase price was $1,425,000.00, subject to the terms of Rider A, attached to and incorporated into the Agreement.

6. Rider A provided:

> The parties hereby agree to the following:
>
> a. The Buyers agree to execute a promissory note as part of the purchase price at the time of closing in the amount of $200,000 @ 5% interest due and payable one year from the closing date, or any written extension signed by the parties.

b. The Buyers intend to file for a Variance with the Town of Barrington seeking to remove the present house, building a new house and/or reconstructing the house with a new configuration. **The buyers agree that they will file for a variance within three months of the . . . closing date** and the Seller agrees that if the Variance is filed prior to the closing, that he will sign the Variance as the owner of the property and cooperate with the Buyers as long as he is the owner.

c. In the event that the Variance is granted within one year of the date of application, then the Buyers shall forthwith pay the promissory note of $200,000 in full with interest thereon @ 5% per annum in arrears, meaning from the date of closing to the date of payment to the Seller.

d. **In the event that the Variance is not granted within one year after application and the Buyers have been diligent and used good faith in their processing of said application for a Variance**, or if the Variance has been denied and any appeal period has expired, then the Buyers shall pay over to the Seller $100,000 and 5% per annum interest on the full value of the note of $200,000 at the time of the denial or at the expiration of any appeal that is processed, together with the interest thereon. The price of the house will be reduced if this provision comes into existence to $1,325,000 plus interest on the face value of the note and all other obligations of the parties shall cease.

[Emphasis added].

7. Pursuant to the Agreement, the parties executed a promissory note (the "Note") on the closing date, October 30, 2003, payable to the plaintiff in the amount of $200,000.00, plus five percent (5%) interest from the closing date to October 30, 2004, and, attorneys' fees and expenses. To date, defendants have made no payment to plaintiff beyond the $1,225,000 tendered at the closing.

8. The Danzells did not file an application for a variance within three months of the closing. In fact, it was not until April 2004, nearly five months after the closing that

defendants first spoke with the project architect for the zoning application. The project architect, Jay Litman, submitted his architectural design proposal to defendants by letter dated April 6, 2004. Defendants did not sign and return the proposal to architect Litman until May 14, 2004, nearly six and one half months post-closing.

9. The defendants' zoning application may not have been a run-of-the mill request for zoning relief, but it was not complicated. Architect Litman prepared the design drawings for the zoning application by June 17, 2004. This was seven and one half months post-closing, but barely a month after the defendants gave him the go ahead.

10. On August 18, 2004, almost ten months after the closing, the defendants finally filed a special use application with the Town of Barrington. The application consisted of a two page form with property information filled in, and four architectural drawings or diagrams. The application was assigned for hearing on October 21, 2004.

11. On October 5, 2004, the Town of Barrington Conservation Commission wrote defendants' counsel, advising that it would formally review defendants' zoning application on October 12, 2004, and encouraged defendants to attend. The Conservation Commission also noted that defendants' application plans did not comply with the Zoning Ordinance, and urged them to correct the plans.

12. Neither defendants nor their counsel nor their project architect attended the Conservation Commission's October 12, 2004 meeting, and no one responded to the Conservation Commission's October 5, 2004 letter.

13. The Barrington Zoning Board of Review consists of five members appointed by the Town Council. The concurring vote of four members of the Board is required to decide in

favor of an applicant for a special use permit.

14. The Barrington Zoning Ordinance specifies four general standards that must be met to obtain a special use permit, and four additional standards governing an application to add to or enlarge a nonconforming use. The defendants' special use permit application was subject to these four additional standards, because the Payne Road property was nonconforming by virtue of the two dwellings located on the property.

15. Of particular importance among the four additional standards is Zoning Ordinance § 185-74B. That standard provides that the applicant for a special use permit covering a nonconforming use must demonstrate to the Zoning Board:

> That the general visual appearance of the nonconforming use shall not be altered in a way so as to heighten or make more apparent its nonconformity and, where possible, shall be improved so as to be more consistent with the surrounding area.

16. At the Zoning Board hearing on October 21, 2004, defendants did not appear, although their attorney and architect did. At the outset of the proceedings, defendants' architect explained that the application was not put together to address the visual appearance standard of the Zoning Ordinance. Instead, what the defendants wanted the Zoning Board to do was to grant a special use permit based only on information about the perimeter - the "footprint" - of an addition that was proposed to be made to the house nearest the water. As defendants' architect put it:

> Litman: For us it's a slightly different kind of application. I assume everyone has the full package that we submitted. And you'll note in the application that we really don't show any articulation of the actual facade to the building.
>
> Litman: The purpose is because we're looking strictly at the zoning issue upon the owners' request to look at expanding as Mr. DeSisto had said for the

south principal structure on the property.

* * * *

Litman: I can't speak a lot about exactly how it's going to look yet because that's sort of Phase 2 for our services.

Litman: They really don't want to go beyond this stage until we know which direction we want to move in. And obviously we're looking to the Zoning Board for some kind of direction and recommendation on that.

* * * *

Litman: Right now, we're looking at what is the maximum that we would need to expand the southern structure to fit the program that they're giving us.

Board Member: To fit whose program?

Litman: The clients' program.

Board Member: Oh, the clients' program.

Litman: Okay, they [the clients] need X number of square feet to the south house to make it feasible for the things they want to do and, you know, the number of bedrooms, etc. So, this is really a, let's look at the expansion of the footprint.

17. The Zoning Board Chairman called this approach "surprising and inappropriate." His statements, made in the course of denying defendants' application for a special use permit, pointedly identified how defendants had deprived the Board of the very information it needed to consider the application.

Chairman: Many times we see applications looking for a variance and we're really focused on the footprint of the building.

* * * *

Chairman: And, you know, sometimes we work with them. But those are for variances. This is for expanding a non-conforming use. And I think there's a heightened review that the Zoning Board has to give on Section

> 74 when someone wants to expand a non-conforming use. And, on this one, I mean, the objector attorney or son-in-law hit it correctly when he said that the general visual appearance and non-conformity shall, non-conforming use, shall not be altered in a way as to heighten or make more apparent its non-conformity. All right? **That is crying out for specific plans as to what you're going to do. And without those specific plans I don't think that any application should be granted.** [Emphasis added]
>
> Chairman: With respect to the other non-conforming application with the garage, we did get some plans from him [the applicant on a separate matter earlier that evening]. It wasn't that he was going to do a lot of physical things. It was he was going to use it with the cars. And even with that he didn't have enough detail, and that's why we sent him back. **This applicant came in here almost shamelessly saying we don't have any plans but we want you to give us the footprint. And that I thought was surprising and inappropriate in that this applicant for the property, this property being a two house, or a lot with two houses on it, should come with specific plans with details as to exactly how they want to expand the non-conforming aspect of it.** So I agree with you, Tom, that that's, I really just, I'm grounded right there and I don't really go beyond to some of the other areas that we could. [Emphasis added]

18. In the minutes of the October 21, 2004 proceedings, the Board noted that "[t]he plans that were presented [by defendants] had no details as to what this structure would look like, which heightens the risk of non-conformity. The applicant has no concrete plans and should have specific plans. The applicant has not met the standards."

Failure To File Within Three Months of the Closing

19. On or about January 13, 2004, counsel for the plaintiff wrote to counsel for the defendants referencing the closing of October 30, 2003 and inquiring whether Mr. Danzell "has filed a variance with the Town of Barrington."

20. A different attorney wrote to plaintiff's counsel on the defendants' behalf in a letter dated January 29, 2004 requesting a copy of the Purchase and Sale Agreement. Counsel for

the plaintiff provided that copy and noted that under the terms of this Agreement, the defendants were required to file for a variance within ninety days of the closing. The letter requested an update on "the progress being made on the variance."

21. On February 17, 2004, counsel for the plaintiff wrote to counsel for the defendants and again asked him to "advise as to the progress being made on the variance."

22. On April 14, 2004, counsel for the plaintiff wrote to counsel for the defendants, referenced previous e-mails and faxed communications, and reminded counsel of the defendants' obligation to file for a variance within ninety days of the October 30, 2003 closing date. This letter advised that plaintiff's counsel had not heard from counsel and had "not been informed that a variance has been sought by the [defendants.]" Counsel asked for a response.

23. On August 18, 2004, defendants' counsel wrote plaintiff's counsel that he had encountered significant problems leading to delay, but that a decision from the Barrington Zoning Board would be made on October 21, 2004.

24. On October 27, 2004, defendants' counsel wrote plaintiff's counsel advising that the Barrington Zoning Board had denied defendants' application for a special use permit.

B. LIST OF WITNESSES

A. James Reyelt – ownership of 10-12 Payne Road, Barrington, Rhode Island; nature of the property; nature of the surrounding area; relationship and power of attorney to Harold Jacobi, III; payments from defendants

B. Harold Jacobi, III – dealing and negotiations with defendants' agents; defendants' offers to purchase; genesis of Rider A; attempts to learn status of zoning application; payments from defendants

C. William Danzell – dealing and negotiations for property; withdrawal of first offer and reasons for doing so; genesis of Rider A; contacts with architect; instructions to

architect; instructions regarding zoning application; payments to plaintiff

D. Louisa F. Beenker Danzell – dealing and negotiations for property; withdrawal of first offer and reasons for doing so; genesis of Rider A; contacts with architect; instructions to architect; instructions regarding zoning application; payments to plaintiff

E. Keeper of Records and Members of Barrington Zoning Board, Jeffrey Brenner, Timothy Morgan, Margaret Carlotto, Thomas Kraig, Neal B. Personeus – documents filed by defendants in Application 3226; tape-recorded October 21, 2004 hearing and Zoning Board decision

F. Keeper of Records of Barrington Conservation Commission – October 5, 2004 and October 21, 2004 letters respecting Danzell zoning application

G. Jay Litman – contacts with defendants; directions from defendants regarding architectural services; directions from defendants regarding zoning application

C. LEGAL CONTENTIONS

**1. The Danzells Did Not Make a Good Faith, Diligent Effort To Obtain Zoning Relief.**

Addendum A to the purchase and sale agreement imposes an express duty on defendants to diligently and in good faith pursue zoning relief for the Payne Road property. Even without this express declaration, Rhode Island law implies such a duty in any contracting party whose performance is conditioned on an action that party undertakes to obtain.

"It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening." Bradford Dyeing Association, Inc. v. J. Stog Tech GmbH, 765 A.2d 1226, 1237 (R.I. 2001). A contracting party is therefore obligated, by the express terms of a contract or the implication of

law, to facilitate the purpose of his contract, and the law will not permit him to benefit from an obstacle to performance which is in his power to remove. Id.

Plaintiff has not found a decision discussing the implications of this duty as respects obtaining zoning relief, but cases concerning a prospective purchaser's failure to provide information required to obtain a mortgage are instructive.

In Hamilton v. Harborview Development Partners, 359 S.E.2d 516 (S.C. App. 1987), buyer sued to recover a deposit made towards purchase of an office condominium. The purchase and sale contract conditioned buyer's obligation on obtaining financing on specified terms. The contract also provided that purchaser would make a good faith effort to obtain financing, and purchaser promised to promptly submit any required information to a source of financing obtained by seller. As time progressed, the purchaser's financial condition deteriorated to the point he decided not to go through with the condominium purchase. He sued to collect his deposit, arguing he made a good faith effort to obtain financing and was unable to do so.

> "The decisive issue at trial was factual: Did [purchaser] make a good faith effort to obtain financing. The [trial] court found he did not." Id., at 359 S.E.2d 517.

On appeal, the trial court's decision was affirmed, principally on the ground that the prospective purchaser did not furnish information, including a tax return and an appraisal, required by the prospective financing bank. The appeals court ruled that on such facts, the purchaser defaulted on the contract and was not entitled to a return of his deposit.

Similarly, in Ray v. Peeples, 387 So.2d 1303 (La. App. 1980), sellers sued to collect a deposit placed with a real estate agent by potential buyers who failed to meet a purchasing deadline. The contract provided that the agreement was conditioned on buyers' being

able to obtain financing. The trial court, affirmed by the appeals court, ruled that the buyers had failed to make a good faith effort to secure financing because the lender denied their application due to insufficient information.

The parallels here are obvious. By the terms of the Barrington Zoning Ordinance, defendants were required to demonstrate to the Zoning Board that the visual appearance of what they intended to do to the Payne Road property would not heighten or increase the appearance of non-conformity. That is what Ordinance §185-74B requires. As the Zoning Board Chairman observed, this was a demonstration that "cried out" for specific plans revealing what the addition would look like. Without such specific plans, the Zoning Board had no competent evidence on which to base a finding that defendants' application satisfied §185-74B. Instead, as defendants' architect admitted, he could not "speak a lot" (he couldn't speak at all) about how it was going to look, because that was Phase 2 of the architectural services he proposed to defendants, and defendants decided they really didn't "want to go beyond" the footprint stage.

Defendants did not diligently pursue zoning relief as their contract obligated them. In resisting plaintiff's motion for summary judgment, defendants contended the "Barrington Zoning Board will not accept a skeleton application and allow an applicant to add on information afterwards." Yet, this is in fact what defendants wanted the Zoning Board to accept. In essence, defendants asked the Zoning Board to grant the special use permit solely on the basis of the "footprint" of what they proposed to build, and the important information, such as the visual appearance of the project under Zoning Ordinance § 185-74B would come at some later point.

**2. The Danzells Breached the 90-Day Filing Requirement.**

The Purchase and Sale Agreement and the related documents signed by the parties provide for a reduction in the purchase price in the event that the Zoning Board denied the defendants' application for a zoning variance. However, the clear and specific language set forth in Rider A required the defendants to apply for a variance within ninety days of the closing date. The defendants did not do so. Instead, they waited until almost ten months after the closing date, and their efforts were not diligent.

"'Contract interpretation is a question of law[.]'" 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d 46, 52 (R.I. 2005), quoting Lajayi v. Fafiyebi, 860 A.2d 680, 686 (R.I. 2004) and Dubis v. East Greenwich Fire District, 754 A.2d 98, 100 (R.I. 2000). A court reviewing the validity of contract terms must "review[] questions of law de novo, and will not construe contractual provisions unless ambiguous." Id.; Lajayi v. Fafiyebi, 860 A.2d at 686; A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d 254, 258 (R.I. 2004). When determining ambiguity, a reviewing court must "view the agreements in their entirety and give the contractual language its 'plain, ordinary and usual meaning.'" Id., quoting Lajayi v. Fafiyebi, 860 A.2d at 686 and A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d at 258. See W.P. Associates v. Forcier, 637 A.2d 353, 356 (R.I. 1994); Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992). Only when an agreement is "reasonably and clearly susceptible" to more than one interpretation is it deemed to be ambiguous. W.P. Associates v. Forcier, 637 A.2d at 356.

It is also well established that "parties are bound by the plain terms of their contract." Capital Properties, Inc. v. State of Rhode Island, 749 A.2d 1069, 1081 (R.I.1999), quoting Vincent Co. v. First Nat'l Supermarkets, Inc., 683 A.2d 361, 363 (R.I.1986). Courts

interpret contract terms to determine the intent of the parties. Id. "[C]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions[.]" Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002). As noted above, when the intentions of the parties can be clearly inferred from the terms of the contract, the court will enforce those intentions as long as they "can be fairly carried out consistent with settled rules of law." 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d at 52, quoting Hill v. M .S. Alper & Son, Inc., 106 R.I. 38, 47, 256 A.2d 10, 15 (1969).

A review of the relevant portions of the Agreements reveals no ambiguity. 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d at 52. The language of Rider A, which was attached to and incorporated into the Agreement, specifically required the defendants to apply for a variance within ninety days. While a breach of a time element is not automatically fatal, where the time fixed for performance is a material part of the contract, a breach of that term will not be excused. Fracassa v. Doris, 814 A.2d 357, 362 (R.I. 2003). In fact, the Rhode Island Supreme Court "has recognized 'the indisputable right of parties to make time of the essence in their contracts[.]'" Id., quoting Safeway System, Inc. v. Manuel Bros., Inc., 102 R.I. 136, 145, 228 A.2d 851, 856 (1967).

Here, the time element was indeed an essential element of the contract. The process for obtaining a variance can be long and complex. See Sciacca v. Caruso, 769 A.2d 578, 583 (R.I. 2001). Clearly, the parties intended to require the defendants to begin the process promptly and pursue it diligently so that any deficiencies in the application or the quantum of evidence to be offered in support of the application could be corrected in the course of the

proceedings.

To read the contract otherwise would ignore established practices of applicants for zoning relief, and would allow the defendants to dally along until the last minute, and a pro forma performance of buyers' contractual obligations would secure the lower purchase price. Here, between these parties, the one-year period for obtaining a decision from the Zoning Board of Review was absolute, and the ninety-day period for beginning the process should be treated similarly. Fracassa v. Doris, 814 A.2d at 362 (time obligations on both parties must be considered). Finally, if there was any doubt as to the parties' intentions, the numerous communications from the plaintiff's counsel should have made it clear that time was indeed of the essence.

A party may not act oblivious to a stipulation in a contract relating to time. The law "assumes that a party to a contract will proceed in good faith towards the completion of his undertaking." Lajayi v. Fafiyebi, 860 A.2d at 688, quoting Jakober v. E.M. Loew's Capitol Theatre, Inc., 107 R.I. 104, 114, 265 A.2d 429, 435 (1970). In this case, no view of the evidence supports a finding of good faith and diligence. The defendants did not simply miss the ninety-day deadline by a few days, but waited nearly ten months before filing for a variance. Even then, they failed to submit to the Zoning Board plans complying with the Zoning Ordinance and necessary to justify the relief they sought. By waiting as long as they did, defendants made sure that there would be no time to develop the type of plans needed to satisfy the Zoning Board. The decision of the Zoning Board came eight days before the one-year deadline. As had to be expected, the application was denied by the Zoning Board.

Under no view of the evidence can defendants' late filing be excused as not

material. Judgment for plaintiff is appropriate. Women's Development Corp. v. City of Central Falls, 764 A.2d 151, 158 (R.I. 2001).

D. Plaintiff's Exhibits

1. Danzell to Herbst – July 23, 2003

2. Residential Properties Fax – August 19, 2003 (3 pages)

3. Purchase and Sales Agreement with Rider A – August 28, September 3, 2003

4. Jacobi to Slepkow – January 13, 2004

5. Town of Barrington Zoning Board of Review Application No. 3226, with Plans dated June 17, 2004

6 A-D. Aerial photographs, 10-12 Payne Road, Barrington, Rhode Island

7. Conservation Commission letter – October 21, 2004

8. Conservation Commission letter – October 5, 2004

9. Zoning Board of Review October 21, 2004 Decision

10. Zoning Board of Review October 21, 2004 Vote Record

11. Tape Recording, October 21, 2004 Barrington Zoning Board Hearing and Decision on Application 3226

12. Transcript of Tape Recording, October 21, 2004 Barrington Zoning Board Hearing and Decision on Application 3226

13. Litman Proposal to Danzells – April 6, 2004

14. Danzell May 14, 2004 Fax to Litman re: April 6, 2004 Proposal

15. Promissory Note – October 30, 2003

16. DeSisto to Litman Fax – October 7, 2004

17. Jacobi to DeSisto – July 15, 2005 (3 pages)

18. Jacobi to DeSisto e-mail – July 15, 2005
19. Jacobi to DeSisto – May 11, 2005
20. Jacobi to DeSisto – February 17, 2004 (2 pages)
21. Jacobi to DeSisto – February 4, 2004
22. DeSisto to Jacobi – December 10, 2004 (3 pages)
23. DeSisto to Jacobi – October 27, 2004
24. DeSisto to Jacobi – April 20, 2004
25. Jacobi to DeSisto – April 14, 2004 (3 pages)
26. DeSisto to Jacobi – January 29, 2004
27. Jacobi to Slepkow – January 13, 2004 (2 pages)
28. Jacobi to Coleman – August 19, 2003 (2 pages)
29. Barrington Zoning Ordinance
30. General Power of Attorney – July 18, 2003
31. Sotheby's Appraisal – April 1, 2003
32. Jacobi to Coleman – August 19, 2003 (2 pages)
33. DeSisto to Jacobi – August 18, 2004

E. Probable Length of Trial

Plaintiff anticipates his case will take one full day to present.

F. Additional Matters

The Court may benefit from a view of the Payne Road property and the

surrounding properties.

/s/ Gordon P. Cleary
Gordon P. Cleary, No. 1948
VETTER & WHITE
Attorneys for Plaintiff
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
gcleary@vetterandwhite.com

Dated: February 14, 2007

CERTIFICATE OF SERVICE

To:

Marc DeSisto, Esq.
DeSisto Law Offices
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563

I hereby certify that I electronically filed this pretrial memorandum on February 14, 2007. The pretrial memorandum is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid, to non-registered parties.

/s/ Gordon P. Cleary