UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JAMES H. REYELT, Plaintiff | ) | C.A. No. 06-0057ML |
| v. | ) | |
| WILLIAM B. DANZELL and LOUISA F. BEENKER DANZELL, Defendants | ) | |

**PLAINTIFF'S POST-TRIAL MEMORANDUM**

**FACTS**

The Purchase and Sale Agreement

1. Plaintiff James H. Reyelt is a citizen of Florida and resides in West Palm Beach, Florida. Defendants William B. Danzell and Louisa F. Beenker Danzell are citizens of South Carolina.

2. In early July 2203, defendants offered in writing to purchase plaintiff's property at 10-12 Payne Road, Barrington, Rhode Island, for $1,425,000, and made a down payment on the purchase. The Payne Road property is a waterfront lot in the Barrington Beach area, with a guest house near the road, a main house near the center of the property, and a freestanding garage. Because the Payne Road property has two residences on one lot, it is a pre-existing, and therefore legal, nonconforming use.

3. On July 23, 2003, defendants advised plaintiff they would not purchase the Payne Road property and had put stop orders on their down payment checks, because the property was "a non-conforming use" and "would require Zoning Board approval for [them] to tear down the main house and construct a new home." [Ex. 1]

4. On August 18, 2003, defendants reversed course, and made a second $1,425,000 offer on the property, subject to an attached addendum. The addendum provided: "Buyer to pay $1,225,000 at closing, and seller to take back a one year note $200,000 … Variance needed to [sic] buyer to add on or construct new house on site. If variance is obtained, at end of one year period, buyer will repay the principle [sic] of $200,000 plus interest. If variance denied, buyer will be obligated to pay ½ of loan amount (or $100,000 plus interest)." [Ex. 2]

5. On August 28, 2003 and September 3, 2003, respectively, the defendants and plaintiff (by power of attorney) executed a Single/Multi Family Purchase and Sales Agreement (the "Agreement") with a Rider A ("Rider A"). The total listed purchase price was $1,425,000.00, subject to the terms of Rider A, attached to and incorporated into the Agreement. [Ex. 3]

6. Rider A provided:

> The parties hereby agree to the following:
>
> a. The Buyers agree to execute a promissory note as part of the purchase price at the time of closing in the amount of $200,000 @ 5% interest due and payable one year from the closing date, or any written extension signed by the parties.
>
> b. The Buyers intend to file for a Variance with the Town of Barrington seeking to remove the present house, building a new house and/or reconstructing the house with a new configuration. The buyers agree that they will file for a variance within three months of the . . . closing date and the Seller agrees that if the Variance is filed prior to the closing, that he will sign the Variance as the owner of the property and cooperate with the Buyers as long as he is the owner.

c. In the event that the Variance is granted within one year of the date of application, then the Buyers shall forthwith pay the promissory note of $200,000 in full with interest thereon @ 5% per annum in arrears, meaning from the date of closing to the date of payment to the Seller.

d. In the event that the Variance is not granted within one year after application and the Buyers have been diligent and used good faith in their processing of said application for a Variance, or if the Variance has been denied and any appeal period has expired, then the Buyers shall pay over to the Seller $100,000 and 5% per annum interest on the full value of the note of $200,000 at the time of the denial or at the expiration of any appeal that is processed, together with the interest thereon. The price of the house will be reduced if this provision comes into existence to $1,325,000 plus interest on the face value of the note and all other obligations of the parties shall cease.

7. Pursuant to the Agreement, the parties executed a promissory note (the "Note") on the closing date, October 30, 2003, payable to the plaintiff in the amount of $200,000.00, plus five percent (5%) interest from the closing date to October 30, 2004, and, attorneys' fees and expenses. [Ex. 15]

<u>The Zoning Application Is Not Filed Timely</u>

8. On or about January 13, 2004, counsel for the plaintiff wrote to counsel for the defendants referencing the closing of October 30, 2003 and inquiring whether Mr. Danzell "has filed for the variance with the Town of Barrington." [Ex. 4]

9. A different attorney wrote to plaintiff's counsel on the defendants' behalf in a letter dated January 29, 2004 requesting a copy of the Purchase and Sale Agreement. [Ex. 26] Counsel for the plaintiff provided that copy by letter dated February 4, 2004 and noted that under the terms of the Agreement, the defendants were required to file for a variance within ninety days of the closing. The letter requested an update on "the progress being made on the variance." [Ex. 21]

10. On February 17, 2004, counsel for the plaintiff wrote to counsel for the defendants and again asked him to "advise as to the progress being made on the variance." [Ex. 20]

11. On April 14, 2004, counsel for the plaintiff wrote to counsel for the defendants, referenced previous e-mails and faxed communications, and reminded counsel of the defendants' obligation to file for a variance within ninety days of the October 30, 2003 closing date. This letter advised that plaintiff's counsel had not heard from counsel and had "not been informed that a variance has been sought by the [defendants.]" Counsel asked for a response. [Ex. 25] Counsel for defendants responded with a letter dated April 20, 2004, stating a hearing before the Barrington Zoning Board was expected on June 17, 2004. [Ex. 24]

12. The Danzells did not file an application for a variance within three months of the closing. In fact, it was not until April 2004, nearly five months after the closing that defendants first spoke with an architect about the zoning application. [Litman 1 Tr.[1] at 64]

13. The project architect, Jay Litman, submitted his architectural design proposal to defendants by letter dated April 6, 2004. Defendants did not sign and return the proposal to architect Litman until May 14, 2004, nearly six and one-half months post-closing. [Ex. 14]

14. Architect Litman prepared the design drawings for the zoning application by June 17, 2004. [Litman 1 Tr. at 79-80] This was seven and one half months post-closing, but barely a month after the defendants gave him the go ahead.

15. On August 18, 2004, defendants' counsel wrote plaintiff's counsel that he had encountered significant problems leading to delay, but that a decision from the Barrington Zoning Board would be made on October 21, 2004. [Ex. 31]

[1] Citations to the May 2, 2007 transcript are referred to as "1 Tr."; citations to the May 3, 2007 transcript are referred to as "2 Tr."

16. On August 18, 2004, almost ten months after the closing, the defendants finally filed an application for zoning relief from the Town of Barrington. The application consisted of a two page form with property information filled in, and four architectural drawings or diagrams. The application sought a special use permit to allow an addition or enlargement of a nonconforming use. The application was assigned for hearing on October 21, 2004. [Ex. 5]

The Zoning Requirements

17. The Barrington Zoning Ordinance specifies four general standards that must be met to obtain a special use permit, and four additional standards governing an application to add to or enlarge a nonconforming use. The defendants' special use permit application was subject to these four additional standards, because the Payne Road property was nonconforming by virtue of the two dwellings located on the property. [Ex. 28]

18. Of particular importance among the four additional standards is Zoning Ordinance § 185-74B. That standard provides that the applicant for a special use permit for a nonconforming use must demonstrate to the Zoning Board "[t]hat the general visual appearance of the nonconforming use shall not be altered in a way so as to heighten or make more apparent its nonconformity and, where possible, shall be improved so as to be more consistent with the surrounding area." [Ex. 28]

The Danzells' Pre-Schematic Planning Study

19. There were two zoning approaches the Danzells could have followed to request Zoning Board approval for a larger, newer residence on the Payne Road property, both roughly costing $1.6 million. [Litman 1 Tr. at 72-73] An "obvious" way would be to dismantle one of the two principal structures and put an addition on the remaining structure. [Litman 1 Tr. at 68]

20. For this approach, the Danzells would need "a slight dimensional variance." Even better, they would not be required "to overcome the qualifications and standards [they] would need to get approval [of a special use permit from the Zoning Board] on two principal structures." [Litman 1 Tr. at 68]

21. The second zoning approach was to expand the southern house, the house closest to the water, and leave the northern house, up by Payne Road, the way it was. [Litman 1 Tr. at 69] However, this second approach "is not the easiest thing to get passed in Zoning." [Litman 1 Tr. at 68] It required a special use permit to expand a nonconforming use.

22. The Danzell application filed with the Zoning Board followed the second approach in concept. The zoning application proposed expanding the southernmost house to 8,000 square feet, "a large house by anybody's standards." [Litman 2 Tr. at 4] Eight thousand square feet represented the "maximum" amount of space called for by the Danzell "program," the design directive they gave architect Litman. [Ex. 12A at 22]

23. Still, the Danzell application was "a slightly different kind of application." [Ex. 12A at 21] Rather than a straight forward application, architect Litman prepared what he called a "pre-schematic planning study." [Litman 1 Tr. at 78] Litman's pre-schematic planning study did not attempt to depict a modified southernmost house which did not heighten or highlight the nonconformity. He gave a number of reasons for this deficiency. He testified, at one point, that "in the venue of a Zoning hearing" "there is almost no way" to integrate the addition into the existing structure "without doing all" the work involved in a very detailed schematic study of the Danzell project. [Litman 2 Tr. at 4, L 1-8] He testified, at another point, that there are <u>no</u> techniques in architecture that could be used to design an addition to the southernmost house that did not heighten or highlight the nonconformity. [Litman 2 Tr. at 5, L

5-7] He testified lastly that "it was a very hard task to do." [Litman 2 Tr. at 5, L 13-18]

24. Litman admitted there are methods or techniques in architecture that could have been employed to design an addition project with a visual appearance more consistent with the surrounding area, but claimed that would not satisfy the standards the Zoning Board had to apply, because "we've just intensified a nonconforming use." [Litman 2 Tr. at 6-7]

25. So, instead, Litman prepared a "pre-schematic" planning study that dealt just "with the mass and the footprint" because the Danzell project "could be dead in the water right out of the box," and Danzell would "be paying us to design two complete schematic designs." [Litman 2 Tr. at 4, L 15-20; 5, L 19-24] Although Litman maintained that with a "conceptual planning study with just a footprint and massing" an applicant "could get approval in principle," he acknowledged a planning study is used "to take the temperature of the way that the [Zoning] Board is thinking and what they might approve and what they might not approve." [Litman 1 Tr. at 77, L 2-22]

26. There was one overarching point in favor of the "pre-schematic planning study." With the first zoning approach as a fallback, to be followed in the event the second approach "was dead in the water right out of the box," the second approach risked a miniscule amount of money. As-built and elevation drawings, costing $3,200, could be used for either the first or second zoning approach. The drawings for the second zoning approach cost $1,500. If a "pre-schematic planning study" was filed as the application, $24,000 did not have to be spent on schematic design. Schematic design results in drawings of what the Danzell project would actually look like. So, by taking the "planning study" route, the Board would reveal "what their decision-making and their attitude is going to be," and all that was at risk was $1,500. [Litman 1 Tr. at 76, L 2-16]

The Zoning Board's Decision

27. The Barrington Zoning Board of Review consists of five members appointed by the Town Council. The concurring vote of four members of the Board is required to decide in favor of an applicant for a special use permit. [Brenner 1 Tr. at 49-50]

28. At the Zoning Board hearing on October 21, 2004, defendants did not appear, although their attorney and architect did. The Danzell planning study was presented by architect Litman. During the course of the October 21, 2004 hearing, neither Litman nor the Danzell attorney stated the Danzell application satisfied the zoning ordinance standards for an addition to a nonconforming use, argued any facts as might apply to the ordinance standards, or even mentioned the ordinance standards. [Ex. 12A at 20 and following]

29. At the Zoning Board hearing on October 21, 2004, one Zoning Board member observed that the drawings submitted with the Danzell planning study "made it look like they were building an auditorium." [Ex. 12A at 33]

30. The Zoning Board Chairman called the planning study approach – depicting only the footprint and "mass" of the proposed addition - "surprising and inappropriate." He elaborated [Ex. 12A at 34-35]:

> Chairman: Many times we see applications looking for a variance and we're really focused on the footprint of the building.
>
> * * * *
>
> Chairman: And, you know, sometimes we work with them. But those are for variances. This is for expanding a non-conforming use. And I think there's a heightened review that the Zoning Board has to give on Section 74 when someone wants to expand a non-conforming use. And, on this one, I mean, the objector attorney or son-in-law hit it correctly when he said that the general visual appearance and non-conformity shall, non-conforming use, shall not be altered in a way as to heighten or make more apparent its non-conformity. All right? **That is crying out for specific**

> **plans as to what you're going to do. And without those specific plans I don't think that any application should be granted.** [Emphasis added]
>
> Chairman: With respect to the other non-conforming application with the garage, we did get some plans from him [the applicant on a separate matter earlier that evening]. It wasn't that he was going to do a lot of physical things. It was he was going to use it with the cars. And even with that he didn't have enough detail, and that's why we sent him back. **This applicant came in here almost shamelessly saying we don't have any plans but we want you to give us the footprint. And that I thought was surprising and inappropriate in that this applicant for the property, this property being a two house, or a lot with two houses on it, should come with specific plans with details as to exactly how they want to expand the non-conforming aspect of it.** So I agree with you, Tom, that that's, I really just, I'm grounded right there and I don't really go beyond to some of the other areas that we could. [Emphasis added]

31. In the minutes of the October 21, 2004 proceedings, the Board noted that "[t]he plans that were presented [in the Danzell application] had no detail as to what this structure would look like, which heightens the risk of non-conformity. The applicant has no concrete plans and should have specific plans. The applicant has not met the standards." [Ex. 9]

32. On October 21, 2004, the Barrington Zoning Board of Review voted 5-0 in favor of denying the Danzell application. [Ex. 10]

33. On October 27, 2004, defendants' counsel wrote plaintiff's counsel advising that the Barrington Zoning Board had denied the Danzell application for a special use permit. [Ex. F]

## ARGUMENT

### I. The Duty of Best Efforts

Under Rhode Island law, "[i]t is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence

of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening." 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d 46, 56 (R.I. 2005), quoting Bradford Dyeing Association, Inc. v. J. Stog Tech, GmbH, 765 A.2d 1226, 1237 (R.I. 2001). Breach of the implied promise of good faith, diligence and best efforts serves as a waiver of the condition, and the breaching party is obligated to perform fully. Bradford Dyeing, 765 A.2d 1228.

The implied promise of good faith, diligence and best efforts is widely recognized and applied. For example, in LaCroix v. Walker, 819 A.2d 1244 (R.I. 2003), the Rhode Island Supreme Court upheld a new trial ruling in favor of a landlord, where the defendant tenant had argued he was not obligated under a lease. The lease was expressly conditioned on the tenant obtaining a franchise to operate a gym. The tenant's defense was that the space would have required taking down walls at a cost of approximately $15,000 to $25,000, and so he had not gone ahead with submitting a floor plan to the gym franchisor or applying for the gym license.

In granting the new trial, the trial court noted the cost of taking down walls, $15,000 to $25,000, was an "insignificant amount when you're looking at a minimum [total leasing cost] of $360,000 over five years." Id. at 819 A.2d 1246. The Supreme Court held that, to satisfy the Bradford Dyeing standard, at a minimum defendant tenant should have submitted a floor plan showing reconfigured walls and applied for the gym lease.

Other jurisdictions recognize the implied promise of good faith, diligence and best efforts. In Carroll v. Harry Norman, Inc., 402 S.E.2d 357 (Ga. 1991), the court characterized a real estate purchase and sale agreement, conditioning buyer's performance on obtaining a fixed rate mortgage loan, as a contract which impliedly obligates the purchaser to "use his best efforts

to bring about the happening of the condition to his promise." Id. at 402 S.E.2d 359.

In Stendig, Inc. v. Thom Rock Realty Company, 558 N.Y.S.2d 917 (App. Div. 1990), dismissal in favor of a landlord was reversed, because the lease conditioned the landlord's performance on 250,000 square feet being leased in a multi-store design center and, because of that condition in his favor, the landlord implicitly promised "to use his good faith best efforts to bring about this result." Id. at 558 N.Y.S.2d 919. The appellate court found it significant that the condition was entirely within the control of the landlord, the party to be bound by the implied promise.

In Wiggins v. Shewmake, 374 N.W.2d 111 (S.D. 1985), the court observed that where a purchase agreement contains a contingency relating to financing, the purchaser is "under an implied promise to use his best efforts to bring about the happening of the condition." Id. at 374 N.W.2d 116. See also, Bonner v. Westbound Records, Inc., 394 N.E.2d 736, 745 (Ill. App. 1979) (citing case involving lease conditioned on obtaining license and permits, "courts in Illinois have consistently required contracting parties to use their best efforts to effectuate the intent of the parties"); Brantley v. Wilson, 2006 WL 436121 (W.D. Ark. 2006) (denying motion for summary judgment in action involving land sale "contingent on financing," on the ground that issue of implied best efforts to promptly obtain financing was in dispute).

The implied promise of best efforts is not simply another name for the implied duty of good faith. "'[B]est efforts' requires more than good faith, which is an implied covenant in all contracts." Kroboth v. Brent, 625 N.Y.S.2d 748, 750 (App. Div. 1995) (considering subdivision approval as a condition).[2] Where a contract includes a "best efforts" obligation, the

[2] Best efforts and good faith have been called equivalent in the context of the Uniform Commercial Code. Gestetner Corporation v. Case Equipment Company, 815 F.2d 806, 811 (1st Cir. 1978). In construing a best efforts clause under Maine law, the First Circuit later cautioned that the standard, whether expressed in terms of good faith or best efforts, varies with the facts and the field of law involved. Triple-A Baseball Club Associates v. Northeastern

contract imposes a duty to make more than a good faith effort. Grossman v. Lowell, 703 F.Supp. 282, 284 (S.D.N.Y. 1989). The duty of best efforts is more exacting than the usual contractual duty of good faith. National Data Payment Systems, Inc. v. Meridian Bank, 212 F.3d 849, 854 (3rd Cir. 2000).

"[I]t is clear that the duty of best efforts is more onerous than that of good faith ... ." Mark Technologies Corp. v. Utah Resources International, Inc., 147 P.3d 509, 512 (Utah App. 2006) quoting TSI Holdings, Inc. v. Jenkins, 924 P.2d 1239, 1250 (Kan. 1996). A best efforts obligation requires that the party "exercise all reasonable efforts within a reasonable time to overcome any hurdles and accomplish the objective." Id., quoting United Telecommunications, Inc. v. American Television & Communications Corp., 536 F.2d 1310, 1318 n. 7 (10th Cir. 1976).

"'Best efforts' requires that [a party] pursue all reasonable methods for obtaining [zoning] approval ... ." Kroboth v. Brent, 625 N.Y.S.2d 748, 750 (App. Div. 1995) (considering subdivision approval as a condition). Activity reasonably calculated to obtain zoning approval by action or expenditure, not disproportionate in the circumstances, must be established. Allview Acres, Inc. v. Howard Investment Corp., 182 A.2d 793, 796 (Md. App. 1962) (considering zoning approval), citing Stabile v. McCarthy, 145 N.E.2d 821, 824 (Mass. 1957) (considering planning board approval).

Best efforts requires that a party "put its muscles to work to perform will full energy and fairness the relevant express promises and reasonable implications therefrom." Macksey v. Egan, 633 N.E.2d 408, 414 (Mass. App. 1994). The party's experience, expertise, financial status and other abilities may be considered in determining whether best efforts have been applied. Id. at 633 N.E.2d 414 n. 17.

---

Baseball, Inc., 832 F.2d 214, 225 (1st Cir. 1987).

A party obligated to use best efforts must actively and in good faith pursue the goal of effecting the condition, and while the party need not spend itself into bankruptcy, it may not pursue its own financial benefit without fair consideration of the effect on the outcome to be achieved. See, Aeronautical Ind. Dist. Lodge, IAM v. United Technologies Corporation, 230 F.3d 569, 578 (2nd Cir. 2000) (using "best efforts" cases to determine whether employer made every reasonable effort to preserve bargaining unit work).

Here, a duty of best efforts clearly fell to Danzell[3]. The zoning condition on the sales price was a contingency he devised and made part of the purchase-sale agreement for his benefit. The agreement, as well, placed with him the burden of obtaining zoning relief. In the circumstances, it was Danzell's obligation to follow a course reasonably calculated to secure zoning relief, and to make all reasonable efforts to succeed by that course. Danzell did not do so.

## II. The Danzell Planning Study Was Not Reasonably Calculated To Obtain Zoning Relief, and Danzell Did Not Exercise All Reasonable Efforts To Prove Entitlement to a Special Use Permit.

Whether defendant Danzell satisfied his best efforts obligation is determined by examining two issues: (1) was his activity reasonably calculated to obtain zoning approval by action or expenditure not disproportionate in the circumstances; and (2) did he exercise all reasonable efforts within a reasonable time to overcome the hurdles established for special use permits under the Barrington Zoning Ordinance?

### A. Danzell's activity was not reasonably calculated to obtain zoning approval for what he wanted to accomplish.

Danzell's purpose in pursuing zoning relief was to enable him to end up with a dwelling for his family. He wanted to tear down the main house and construct a new house.

---

[3] For the sake of simplicity, the defendants Danzells are referred to as "defendant Danzell" or "Danzell."

[Ex. 1] His first preference was to tear down the main house because it did not seem to him to be something that could be remodeled. [Danzell 2 Tr. at 26] Litman recognized that "the obvious way" for Danzell to accomplish his goal was to take down one of the two structures and apply for "a slight dimensional variance instead of trying to overcome the qualifications and standards you would need to get approval on two principal structures." [Litman 1 Tr. at 68]

Instead, or perhaps because his family was still "simply up in the air about ... really want[ing] to move to Barrington" [Danzell 2 Tr. at 21], he filed for a special use permit for something that was not his first choice, and which architect Litman, who had been before the Barrington Zoning Board two or three times, acknowledged was "not the easiest thing to get passed in Zoning." [Litman 1 Tr. at 68, 2 Tr. at 13] To make it the cheapest vehicle for getting before the Zoning Board, the application for a special use permit became "a slightly different kind of application." [Litman, Ex. 12A, p. 21] It was a "conceptual planning study," or more precisely "a pre-schematic planning study." Litman contended it was "conceivable" the Board would give "flat out approval," but conceded the real purpose of a "planning study" is to "take the temperature of what the Board is thinking and what they might approve and what they might not approve." [Litman 1 Tr. at 77]

Getting a reading on the Board, not getting a special use permit for a defined, articulated plan, was the obvious purpose of the Danzell application. Everything the Danzell interests said and did revealed that purpose:

- Architect Litman, the only witness for the application, told the Board "[t]his really is a starting point. They [the Danzells] really don't want to go beyond this stage until we know what direction we want to move in."

- Architect Litman told the Board, "I can't speak a lot about exactly it's going to look yet because that's sort of Phase 2 for our services."

- Architect Litman told the Board the purpose of the application "really is just to explore whether we can, in fact, expand one of the two principal structures."

- Architect Litman told the Board, "And we have two options here ... expanding one of the ... two principal structures ... [or] take the historic home ... build an addition onto that ... [and] perhaps taking down the structure closest to the beach."

- Architect Litman told the Board, "So, this is really a, let's look at the expansion of the footprint. Let's see what zoning issues we run into and, of course, we've run into expanding one of two houses on the site when there is really only supposed to be one."

- Architect Litman told the Board, "[a]nd obviously, we're looking to the Zoning Board for some kind of direction and recommendation on that." Which prompted the obvious question from the Board, "So what are you seeking from us?"

- The "pre-schematic" drawings submitted with the Danzell application committed to no specific visual configuration or appearance, thereby depicting a structure resembling an auditorium or a barn.

None of this is reasonably calculated to securing zoning relief. As the Board minutes recite, the Danzell application lacked concrete plans. Were the Board to have granted a special use permit – putting aside whether it could legally do so – it would have scant conception of the dwelling it was giving permission to erect. At bottom, the only reasonable outcome from an application composed and presented as the Danzells' was a denial to be followed by another, different application for a variance as described by architect Litman. The Danzell application was nothing more than what the Zoning Board Chairman called it, a "trial balloon." [Ex. 12 at 30] The Zoning Board had no authority to grant a special use permit for a project tentatively announced in order to test public opinion.

B. Did Danzell exercise all reasonable efforts to overcome the hurdles established for special use permits under the Barrington Zoning Ordinance?

Danzell did not exercise all reasonable efforts to satisfy the conditions established in the Barrington Zoning Ordinance for special use permits.

Rhode Island law is well settled that an applicant seeking to obtain a special use permit must satisfy the rules and standards set out in the ordinances permitting such relief. Sea View Cliffs, Inc. v. Zoning Board of Review, 309 A.2d 20 (R.I. 1973) (considering precursor to special use permit, special exception). The applicant has the burden of presenting competent evidence to establish entitlement to relief under the conditions of the zoning ordinance. Toohey v. Kilday, 415 A.2d 732 (R.I. 1980). The rules and standards governing a board's authority to grant a special use permit are "conditions precedent that must be met" before the zoning board is empowered to grant a special use permit. Guiberson v. Roman Catholic Bishop, 308 A.2d 503, 506-7 (R.I. 1973).

According to Section 185-74 of the Barrington Zoning Ordinance, when presented with an application for a special use permit to add or enlarge a nonconforming use, the Zoning Board "shall require that the applicant demonstrate each of the following:"

> A. That it will not result in the creation or increase in any undesirable impacts related to the use, such as excessive noise, traffic and waste generation.
>
> B. That the general visual appearance of the nonconforming use shall not be altered in a way so as to heighten or make more apparent its nonconformity and, where possible, shall be improved so as to be more consistent with the surrounding area.
>
> C. That it will not have a negative impact on the natural environment or on any historic or cultural resource.

D. The resulting nonconforming use will be a beneficial use to the community. [Pls. Ex. 28]

These criteria are the conditions precedent which must have been met before the Barrington Zoning Board had legal authority to grant a special use permit. Guiberson, Id. (citations omitted); S Net Cellular, Inc. v. Angell, 99 F.Supp.2d 190, 196 (D.R.I. 2000). Thus, defendants Danzell bore the burden of satisfying each of these conditions, and particularly the condition in Section 185-74(B), in the case put before the Barrington Zoning Board of Review.

Architect Litman's testimony about Section 185-74(B) standard was inconsistent. On one hand, according to Litman, there were no architectural techniques he could use such that the nonconformity would not be heightened or made more apparent. Yet, he went ahead with the application before the Zoning Board, aware of a condition in the zoning ordinance he later claimed was impossible to satisfy. On the other hand, Litman also testified that, in the context of a zoning hearing, "integrating" the mass of the addition to the existing structure in a complete schematic design was possible, albeit perhaps very difficult. [Litman 2 Tr. at 4, L 1-8]

Particularly noteworthy, however, is what Litman said about the additional standard in Ordinance 185-74(b), viz., where possible, the alteration make the visual appearance of the addition make the structure more consistent with the surrounding area. Litman admitted that there are architectural techniques that could be employed to make the visual appearance more consistent with the surrounding area, but they were not employed because he thought that was not part of the standard the Zoning Board would be looking at, and that would cost more money. [Litman 2 Tr. at 6-7]

This points to the heart of the matter. The Danzell application was nothing more than an inexpensive shot in the dark. As Litman explained it, because there was a fallback position, albeit somewhat more expensive, "it would make sense to minimize [Danzell's

expense] for really $1,500. If you had to choose between 1,500 [for zoning drawings for the special use permit] and 24,000 [for schematic design], knowing the 3,200 [for as built and elevation plans] you're going to have to spend either way [i.e., usable for the first application and for the reapplication for the fallback project] you know, it's probably wise to spend that money up front and <u>get a feel</u> for whether the Board's going to approve that or not." [Litman 1 Tr. at 76] [Emphasis added.]

This is precisely what caused Danzell to follow the course he did. He wanted to minimize the expense, because he and his family were still undecided whether they really wanted to move to Barrington. He had the $28,000 to pay for drawings that would show the visual appearance of the project he was putting before the Zoning Board, but he did not want to risk spending that amount when he could get a sense of the Zoning Board's inclination for far less – $3,000 by his reckoning, $1,500 by Litman's reckoning. [Danzell 2 Tr. at 21-24]

The problems with all of this are: (1) the Zoning Board has no authority to do anything except grant or deny applications for special use permits; (2) the Zoning Board has no power to grant a special use permit for an addition to a nonconforming use unless, among other factors, the applicant presents evidence that the general visual appearance of the nonconformity will not be heightened or made more apparent; and (3) Rider A to the purchase and sale agreement does not require a "pre-schematic planning study" to be filed; it requires a competent, complete application for zoning relief that provides the Board with the evidence it needs to make a favorable decision. Whether Litman could design an "integrated" addition only at some level of expense, or whether it "could not be done," in either case the Barrington Zoning Board did not have evidence before it of what visual appearance would result if the application was granted. This was necessary evidence, and it was not presented.

In the end, Danzell's failure to use best efforts takes two forms. The first failure is filing an application for a special use permit that is legally insufficient because it is "not possible" to satisfy Ordinance Section 185-74(B). The second failure is filing an application for a special use permit that fails to establish satisfactory general visual appearance and consistency with the surrounding area because it is too expensive. In the context of this project, with a $1.425 million purchase price, and a $1.6 million addition cost, requiring $24,000 to be spent on schematic design drawings is not unreasonable. Refusing to spend $24,000 on schematic design drawings is unreasonable.

**III. The Danzells Breached the 90-Day Filing Requirement.**

The Purchase and Sale Agreement and the related documents signed by the parties provide for a reduction in the purchase price in the event that the Zoning Board denied the defendants' application for a zoning variance. However, the clear and specific language set forth in Rider A required the defendants to apply for a variance within ninety days of the closing date. The defendants did not do so. Instead, they waited until almost ten months after the closing date, and their efforts were not diligent.

"'Contract interpretation is a question of law[.]'" 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d 46, 52 (R.I. 2005), quoting Lajayi v. Fafiyebi, 860 A.2d 680, 686 (R.I. 2004) and Dubis v. East Greenwich Fire District, 754 A.2d 98, 100 (R.I. 2000). A court reviewing the validity of contract terms must "review[] questions of law de novo, and will not construe contractual provisions unless ambiguous." Id.; Lajayi v. Fafiyebi, 860 A.2d at 686; A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d 254, 258 (R.I. 2004). When determining ambiguity, a reviewing court must "view the agreements in their entirety and give the contractual language its 'plain, ordinary and usual meaning.'" Id., quoting Lajayi v. Fafiyebi,

860 A.2d at 686 and A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d at 258. See W.P. Associates v. Forcier, 637 A.2d 353, 356 (R.I. 1994); Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992). Only when an agreement is "reasonably and clearly susceptible" to more than one interpretation is it deemed to be ambiguous. W.P. Associates v. Forcier, 637 A.2d at 356.

It is also well established that "parties are bound by the plain terms of their contract." Capital Properties, Inc. v. State of Rhode Island, 749 A.2d 1069, 1081 (R.I.1999), quoting Vincent Co. v. First Nat'l Supermarkets, Inc., 683 A.2d 361, 363 (R.I.1986). Courts interpret contract terms to determine the intent of the parties. Id. "[C]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions[.]" Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002). As noted above, when the intentions of the parties can be clearly inferred from the terms of the contract, the court will enforce those intentions as long as they "can be fairly carried out consistent with settled rules of law." 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d at 52, quoting Hill v. M .S. Alper & Son, Inc., 106 R.I. 38, 47, 256 A.2d 10, 15 (1969).

A review of the relevant portions of the Agreements reveals no ambiguity. 1800 Smith Street Associates, LP v. Gencarelli, 888 A.2d at 52. The language of Rider A, which originated with Danzell, and was attached to and incorporated into the agreement, specifically required Danzell to apply for a variance within ninety days. While a breach of a time element is not automatically fatal, where the time fixed for performance is a material part of the contract, a breach of that term will not be excused. Fracassa v. Doris, 814 A.2d 357, 362 (R.I. 2003). In fact, the Rhode Island Supreme Court "has recognized 'the indisputable right of parties to make

time of the essence in their contracts[.]'" Id., quoting Safeway System, Inc. v. Manuel Bros., Inc., 102 R.I. 136, 145, 228 A.2d 851, 856 (1967).

Here, the time element was indeed an essential element of the contract. The process for obtaining a variance can be long and complex. See Sciacca v. Caruso, 769 A.2d 578, 583 (R.I. 2001). Clearly, the parties intended to require Danzell to begin the process promptly and pursue it diligently so that any deficiencies in the application or the quantum of evidence to be offered in support of the application could be corrected in the course of the proceedings. Instead, a half-baked concept study went forward because Danzell was "still up in the air" about whether he wanted to live in Rhode Island.

To read the contract otherwise would allow Danzell to dally along until the last minute, and be satisfied with a pro forma zoning application which, if it wasn't granted, would secure the lower purchase price and leave Danzell in a position to pursue his fallback variance application. Here, between these parties, the one-year period for obtaining a decision from the Zoning Board of Review was absolute, and the ninety-day period for beginning the process should be treated similarly. Fracassa v. Doris, 814 A.2d at 362 (time obligations on both parties must be considered). Finally, if there was any doubt as to the parties' intentions, the numerous communications from the plaintiff's counsel should have made it clear that time was indeed of the essence.

A party may not act oblivious to a stipulation in a contract relating to time. The law "assumes that a party to a contract will proceed in good faith towards the completion of his undertaking." Lajayi v. Fafiyebi, 860 A.2d at 688, quoting Jakober v. E.M. Loew's Capitol Theatre, Inc., 107 R.I. 104, 114, 265 A.2d 429, 435 (1970). In this case, no view of the evidence supports a finding of diligence. Danzell did not simply miss the ninety-day deadline by a few

days, but waited nearly ten months before filing for a variance. Even then, Danzell failed to submit evidence necessary to earn the relief sought. By waiting as long as he did, Danzell made sure that there would be no time to act on his fallback plan within a year. The decision of the Zoning Board came eight days before the one-year deadline. As had to be expected, the application was denied by the Zoning Board.

For all of these reasons, plaintiff respectfully requests judgment be entered in his favor.

/s/ Gordon P. Cleary
Gordon P. Cleary, No. 1948
VETTER & WHITE
Attorneys for Plaintiff
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
gcleary@vetterandwhite.com

Dated: May 31, 2007

CERTIFICATE OF SERVICE

To:

Marc DeSisto, Esq.
DeSisto Law Offices
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563

I hereby certify that I electronically filed this Post-trial Memorandum on May 31, 2007. The Post-trial Memorandum is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid, to non-registered parties.

/s/ Gordon P. Cleary