UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JAMES H. REYELT,
Plaintiff,

v. C.A. No. 06-57L

WILLIAM B. DANZELL and
LOUISE BEENKER DANZELL,
Defendants.

DECISION

Ronald R. Lagueux, Senior District Judge.

This is a contract dispute between the seller and the buyers of real property located at 10-12 Payne Road, in Barrington, Rhode Island. After negotiating a purchase price for the property, the parties entered into a purchase and sale agreement, with an incorporated promissory note and a rider, labeled Rider "A." Rider "A" (hereinafter designated as "the Rider") contained certain terms which provide the focus of the parties' disagreement in this case and will be explained at length below. The closing on the property took place on October 30, 2003. The ensuing dispute culminated in a federal lawsuit, based on diversity jurisdiction, filed in February 2006. The case was litigated during a two-day bench trial before this Court in May 2007 and the parties then submitted post-trial briefs. After a review of the trial testimony, the exhibits and the parties' post-trial submissions, this Court now renders a decision for Defendants on the main issue presented in this case. In short, Defendants are liable to pay only $100,000.00 plus interest

pursuant to the Rider and promissory note, rather than the $200,000.00 plus interest claimed by Plaintiff.

**Findings of Fact**

For many years, Plaintiff James H. Reyelt lived with his family at the property located at 10-12 Payne Road. The lot is approximately 100 feet by 350 feet, running from Payne Road on the north down to Barrington Beach on the south. There are two houses on the lot: 12 Payne Road, an older, smaller home sited near the road, which Plaintiff rented to tenants; and 10 Payne Road, Plaintiff's former residence, a newer, larger home sited to take advantage of the water view. Because there are two houses on one lot, the property is classified by the Town of Barrington as a legal but "non-conforming" use.

In 2003, after the death of his wife, Plaintiff decided to list his property for sale through a local realty agency. He retained his cousin's husband, Harold Jacobi, an attorney based in Boston, to represent him during the negotiations and sale of the property, and granted Jacobi power of attorney to act on his behalf as necessary. In July 2003, Plaintiff accepted an offer to sell the property to Defendants for $1,425,000. Soon after making their down-payment, Defendants discovered that, because of the property's non-conforming status, approval from the Town's Zoning Board would be required to make changes to either of the houses. On July 23, Defendants placed a stop order on their

down-payment check and retracted their offer.

***The new deal***

On August 18, 2003, Defendants renewed their offer of $1,425,000, subject to an addendum: Defendants would pay $1,225,000 at the closing and provide Plaintiff with a one-year promissory note for $200,000. If Defendants received a variance to construct a new house or add on to one of the existing houses by the end of the year, they would pay the note in full. If a variance was denied, Defendants would pay only half the promissory note's amount, and the purchase price would be adjusted accordingly.

On August 28 and September 3, 2003, the parties entered into this agreement in writing, executing a purchase and sale agreement with the Rider. Because of its importance to the dispute, the entirety of the Rider is set forth below:

> The parties hereby agree to the following:
>
> 1. The Buyers agree to execute a promissory note as part of the purchase price at the time of the closing in the amount of $200,000 @ 5% interest due and payable one year from the closing date, or any written extension signed by the parties.
>
> 2. The Buyers intend to file for a Variance with the Town of Barrington seeking to remove the present house, building a new house and/or reconstructing the house with a new configuration. The Buyers agree that they will file for a Variance within three

> months of the date of the closing date[1] and the Seller agrees that if the Variance is filed prior to the closing, that he will sign the Variance as the owner of the property and cooperate with the Buyers as long as he is the owner.
>
> 3. In the event that the Variance is granted within one year of the date of application, then the Buyers shall forthwith pay the promissory note of $200,000 in full with interest thereon @ 5% per annum in arrears, meaning from the date of closing to the date of payment to the Seller.
>
> 4. In the event that the Variance is not granted within one year after application and the Buyers have been diligent and used good faith in their processing of said application for a Variance, or if the Variance has been denied and any appeal period has expired, then the Buyers shall pay over to the Seller $100,000 and 5% per annum interest on the full value of the note of $200,000 at the time of the denial or at the expiration of any appeal that is processed, together with the interest thereon. The price of the house will be reduced if this provision comes into existence to $1,325,000 plus interest on the face value of the note and all other obligations of the parties shall cease.

As agreed, Defendants executed the promissory note at the closing on October 30, 2003. Defendants were represented at the closing by Attorney Matthew Slepkow. Jacobi attended the closing on behalf of Plaintiff.

---

[1] Attorney Jacobi testified at trial that he suggested the three-month time limit for the variance application. When the Rider was executed, Defendants extended the time limit from three months from the execution of the purchase and sale agreement to three months from the closing.

***Preparation of the zoning application***

The calendar year drew to a close with no further activity on the zoning application. Defendant William Danzell testified that he was under the impression that his closing attorney would prepare the application. However when he contacted Slepkow, possibly in December, he learned that this was not the case, and he was referred to Attorney Anthony DeSisto[2] for this service. In the meantime, Jacobi wrote to Slepkow, and to Defendants inquiring about the progress of the zoning application.

On January 29, 2004, Jacobi received a letter from DeSisto indicating that he was representing Defendants, and requesting a copy of the purchase and sale agreement. Jacobi complied, calling DeSisto's attention to the portion of the Rider specifying that the zoning application was to be filed within three months of the closing. He received no response and wrote again. On April 20, 2004, Jacobi received an apologetic reply from DeSisto. DeSisto explained that he had been unable to work due to an injury, but that some "preliminary work" had been done and he hoped a hearing on the request would take place in June.

The preliminary work presumably consisted of Defendant William Danzell meeting with architect Jay Litman of Newport

[2] This being Rhode Island, Defendants were represented by Anthony DeSisto at the zoning hearing, and by his brother, Marc DeSisto, at the trial. References to DeSisto in this decision refer to Anthony DeSisto, who was a witness at the trial.

Collaborative Architects, which took place at the end of March or beginning of April. Litman testified at trial that he told Danzell that, "... you know, the most obvious way to deal with this is you're going to have to tear down one of the houses and extend the other house so you only have one primary residence on the property." Nevertheless, based on a letter of engagement from Litman to the Danzells, dated April 6, 2004, which recaps their discussions and outlines their plan, it appears that instead they decided to tear down the waterfront house (10 Payne Road)[3] and rebuild a "substantially larger" new house on the same site. The letter also states, "Ultimately the plan is to renovate House "A" as a guest cottage and connect an addition to House "B" to create a new 8,000 SF family compound together with the Guest Cottage and a 2-car, 500 SF garage."

Litman's letter outlines a proposed fee structure, including 1) $3,200 for "As-Built Existing House Plans and Elevations;" 2) $1,500 for "1st Phase - Zoning Package;" and 3) $24,000 for "Schematic Design" of the new house. Five weeks later, on May 14, Danzell faxed a copy of Litman's letter back to him. Danzell checked off as accepted the fees for as-built housing plans and the zoning package, but wrote "Wait" with his initials next to the schematic design line. Danzell also attached a handwritten

[3] The waterfront house was called House "B" by the architect.

note, which stated in part, "Jay - We still do not know if we are going to build the $1.6 million addition. So, if possible, we want to limit our expense to the 1st phase + As Built."

In August, DeSisto wrote to Jacobi again, explaining that he had "encountered some significant problems that have led to the delay in obtaining the necessary permits and approvals regarding Mr. Danzell's plans..." DeSisto offered further that the Town of Barrington's Zoning Ordinance prohibited two single-family residences on one lot, and that, consequently, Defendants' application would be for a "special use permit," not the 'variance' referenced in the Rider. Lastly, Desisto notified Jacobi that the hearing was scheduled for October 21, 2004.

***The zoning application***

The Barrington Zoning Code specifies four general standards for special use permits under § 185-73,[4] and four additional

---

[4] § 185-73. General standards. A use requiring a special use permit in Article IV and elsewhere in this chapter may be permitted by the Zoning Board of Review following a public hearing only if, in the opinion of the Board, such proposed use and its location on the site meets each of the following requirements:
A. The public convenience and welfare will be substantially served.
B. It will be in harmony with the general purpose of this chapter, and with the Comprehensive Community Plan.
C. It will not result in or create conditions that will be inimical to the public health, safety, morals and general welfare of the community.
D. It will not substantially or permanently injure the appropriate use of the property in the surrounding area or district.

standards for non-conforming uses under § 185-74.[5] In order for a permit to be approved, four of the five-member Board has to vote in favor of approval, a so-called super-majority. According to Providence lawyer Jeffrey Brenner, who testified at the trial in his capacity as chairman of the Barrington Zoning Board, Defendants' application was not reviewed by the Zoning Board prior to the hearing, except that it was reviewed and accepted as to form by the Town's Building Official when it was filed.

The application, Number 3226, dated August 18, 2004, consisted of a two-page form, with four attached pages of architectural drawings prepared by Litman's firm. The information on the form provides that the 12 Payne Road house is 1,140 square feet, with a 540 square foot garage, and that the 10

---

[5] § 185-74. Standards relating to nonconforming uses. In addition to the standards of § 185-73, when reviewing a special use permit application for the change in a nonconforming use to another nonconforming use, or for the extension, addition to or enlargement of a nonconforming use, the Zoning Board of Review shall require that the applicant demonstrate each of the following:
A. That it will not result in the creation of or increase in any undesirable impacts related to the use, such as excessive noise, traffic and waste generation.
B. That the general visual appearance of the nonconforming use shall not be altered in a way so as to heighten or make more apparent its nonconformity and, where possible, shall be improved so as to be more consistent with the surrounding area.
C. That it will not have a negative impact on the natural environment or on any historic or cultural resource.
D. That the resulting nonconforming use will be a beneficial use to the community.

Payne Road house is 1,220 square feet. The proposed alterations are: "Applicant proposes to renovate and add an addition to 10 Payne Road as shown on the attached plans. The proposed addition is 1,550 sq. ft. The size of 10 Payne Road will be increased 2,590 sq. ft." The form also noted that there would be six parking spaces on the lot. The attached diagrams included: 1) a map showing the abutters within a 200 foot radius of the lot; 2) an aerial view showing the existing houses and garage, with the proposed addition, indicated by cross-hatching, superimposed on top of 10 Payne Road; 3) a side or back view of 10 Payne Road, showing the 17' 4" existing house, with an 11' 8" crosshatched section marked 'renovation' and a 30' 5" crosshatched section marked 'addition;' and 4) the opposite side, again showing the existing portion of the house and 42'+ crosshatched section identified as part addition and part renovation. Pictures 3 and 4 were labeled as "massing elevations" and contained little detail as to the visual appearance of the proposed new construction; instead, they demonstrated only the footprint of the proposed addition and how it would be sited on the property.

***The hearing***

DeSisto and Litman both appeared at the zoning hearing on Defendants' behalf. DeSisto testified at trial that he had previously appeared before the Barrington Zoning Board over 100 times. Litman had appeared before the Board two or three times.

A transcript of the hearing, with notations and corrections made by Brenner,[6] was admitted as evidence at the trial.

The transcript shows that the Board members initially spent considerable time discussing the proximity of the proposed house to the beach and whether or not the project required approval from the Rhode Island Conservation Commission, or Coastal Resource Management Council. The Board members clearly were not familiar with the property, and thought, mistakenly, that there was a road and/or a parking lot between the property and Barrington Beach. Prior to the hearing, the Conservation Commission had sent a letter to the Board requesting that they refrain from acting on Defendants' application until the Commission had an opportunity to review the proposed project. However, DeSisto argued that this issue would be addressed later at the building permit stage, and was not within the jurisdiction of the Zoning Board. This issue was not resolved, but the members nonetheless decided to proceed with the hearing.

DeSisto then introduced Litman, who passed out some photographs of the site, and explained the project as follows:

> And you'll note in the application that we really don't show any articulation of the actual facade to the building. The purpose is because we're looking strictly at the zoning issue upon the owners' request to look

---

[6] Brenner testified that, prior to the trial, he listened to a tape recording of the hearing and noted his corrections on the transcript.

> at expanding as Mr. DeSisto had said for the south principal structure on the property. And we have two options here, obviously. One is to try to pursue expanding one of the houses in a non-conforming lot that has two principal structures. Should this be denied, the second option is to try to take the historic home at the front of Payne Road and somehow build an addition on to that and create one principal structure, perhaps taking down the structure closest to the beach. And so the purpose of this application really is to just explore whether we can, in fact, expand one of the principal structures, obviously the one closer to the beach because that would be the more preferable one. I can't speak a lot about exactly how it's going to look yet because that's sort of Phase 2 for our services. What we have done in the package you have is basically document what is on the property right now, so we have a starting point. They really don't want to go beyond this stage until we know what direction we want to move in. And obviously we're looking to the Zoning Board for some kind of direction and recommendation on that.

The next speaker was Darren Corrente, a lawyer and son-in-law of the next-door neighbors, Arthur and Joanne Coia of 20 Payne Road. Corrente urged the Board to reject the project, stressing that there were already three structures on the property, counting the garage, and that the proposal called for more than doubling the size of one of the existing structures, bringing the new construction to within 14 feet of his in-laws' property line. He went on, "If you look at, if you look at what the Zoning Ordinance says in allowing this application under 185-74, the general visual appearance of the non-conforming use shall

not be altered in any way so as to heighten or make more apparent its non-conformity. Well, adding 1,500 square feet to a non-conforming use does nothing but heighten the non-conformity, and clearly the appearance is going to be, it's going to be much greater, this appearance of this non-conformity." A second neighbor then spoke and expressed her concern over the continued use of 12 Payne Road as a rental property and the additional traffic generated.

Later in the evening, the Board discussed and then voted on Defendants' application. Moving that the application be denied, Board member Tom Kraig stated, "... In this case, the proposal is to more than double the size of this particular dwelling unit upon the property. I think by definition that increases the general visual appearance of the non-conforming use to make it, or to heighten its non-conformity. It's more obvious particularly since it is going so close to that one side line, much closer than the existing house is." Board member Neal Personeus seconded the motion.

Board member Paul Ryan concurred with Kraig and Personeus: "Beyond that, this is the only non-single family unit in the entire area. You want to put that on the record. The entire rest of the area is single family homes with one house on the lot."

Personeus complained that there "was no detail as to what

this structure was going to look like" because the application lacked architectural plans. Kraig responded, "Well, I wouldn't attach too much weight to that, you know, because I think that was intended simply to give a sense of the mass without any architectural details." But Brenner added that the project was "crying out for specific plans as to what you're going to do."

Kraig concluded the discussion by asserting that the standards for a special use permit had not been met because there was no showing that public welfare would be substantially served; no showing that the project would be in harmony with the general purpose of the Town's comprehensive plan; no showing that the project would not result in conditions inimical to the general welfare of the community, including safety; and no showing that the project would not substantially harm the appropriate use of the surrounding property. The application was then voted down unanimously.

Later that week, DeSisto wrote to Jacobi notifying him of the Board's action. According to DeSisto's uncontradicted trial testimony, he called Jacobi in December 2004 or January 2005 and offered to send the payment of $100,00 plus interest, which was being held in an escrow account. Jacobi refused to accept the payment, and this lawsuit ensued.

**Analysis and Conclusions of Law**

Plaintiff alleges that Defendants had a duty to use their

best efforts to obtain the special use permit and that they failed to do so; and that, moreover, their failure to apply for the permit within the three-month time period designated in the Rider represents a breach of the contract. Consequently, Plaintiff argues that he is entitled to the total amount of the promissory note, $200,000 plus interest.

***Three-month deadline for filing zoning application***

Plaintiff asserts correctly that Defendants failed to comply with the three-month time period specified in paragraph 2 of the Rider: "The Buyers agree that they will file for a Variance within three months of the date of the closing date..." Pursuant to this section, Defendants should have filed the application by the end of January 2004. However, their application was not filed until mid-August 2004. Plaintiff argues that this represents a breach of an essential element of the contract.

Defendants counter that the one-year time period for the variance to be granted (or not) was the significant time period for performance of the contract. The three-month time frame for Defendants to file the application was included to ensure that the Zoning Board would have an opportunity to act on the application before the one-year anniversary of the closing. Furthermore, Defendants point out that Plaintiff knew at the end of January that they had not filed their application and did not object until after the application had been denied. This

inaction, Defendants argue, constitutes a implied waiver of the contract term.

The Court concurs with Defendants' construction of the three-month contract term. Many years ago, the Rhode Island Supreme Court wrote that, "A contract is not to be construed like a railway time-table." Furlong v. Barnes, 8 R.I. 226, 229 (1865). Rather, "...the contract is to receive a reasonable construction, having regard to its character and objects, and to the apparent meaning of the parties in view of the circumstances under which it was made." Id. at 229; *see also* Safeway System v. Manuel Bros., 102 R.I. 136, 145-146 (1967); Fracassa v. Doris, 814 A.2d 357, 362-363 (R.I. 2003). In the case of this contract, the Court concludes that the three-month time period was inserted for two reasons. One was to put Defendants on notice of the possible time involved in processing a zoning application and to encourage them to get the process going. The second purpose of the three-month time limit was to serve as a benchmark to evaluate Defendants' diligence in the event that they had filed their application, but it had not been acted upon by the Zoning Board at the time of the anniversary of the closing. As it happened, while Defendants were indeed dilatory (within the framework of the Rider) in submitting their zoning application, they did manage to get in under the wire, receiving the ruling on the application a week before the anniversary date of the

closing, as contemplated by the terms of the Rider.

***The implied duty of 'best efforts'***

Plaintiff argues that Defendants had an implied duty to fulfill the contract terms (that is, apply for and obtain a zoning variance) in good faith, using diligence and their best efforts. Defendants argue that the duties of good faith and diligence, being expressly included in paragraph 4 of the Rider, were intentionally omitted in the other three paragraphs and cannot then be implied. In this particular dispute, the Court sides with Plaintiff.

Judge Cardozo of the New York Court of Appeals is credited with originating the concept of an implied duty to use 'best efforts' in order to impose mutuality of obligations in a contract which otherwise lacked an explicit *quid pro quo*. In Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917), Lady Duff-Gordon made an arrangement with Wood to market her fashion designs. His right to market her fashions was to be exclusive, and they were to share the profits. However, Lady Duff-Gordon marketed her fashions outside of the arrangement with Wood, and withheld the profits. She argued that there was no contract because Wood had not bound himself to anything. Judge Cardozo wrote,

> It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however,

> that such a promise is fairly to be implied.

118 N.E. at 214. The Rhode Island Supreme Court has recognized the implied duty to use best efforts, and cited it recently in Bradford Dyeing v. J. Stog Tech GMBH, 765 A.2d 1226, 1237 (R.I. 2001), when it wrote,

> It is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring about that happening.

In the present case, this Court holds that the duty to use best efforts, as well as good faith and diligence, permeates the Rider in its entirety. Plaintiff agreed to forgo the receipt of the $200,000 balance of the property's purchase price for one year, and Defendants agreed that during that year they would diligently pursue permission to build the kind of residence on the property that they desired. According to the clear meaning of the Rider, if Defendants ultimately decided against moving to Rhode Island, or decided that the property was habitable in its current state, their obligation to pay $200,000, plus interest, on the anniversary of the closing would remain in force. Defendants could only be released from the full $200,000 payment if they applied for zoning relief, diligently, in good faith and

using their best efforts, and such relief was denied within a year of the closing. In that eventuality, they would only owe Plaintiff $100,000.

***Defendants' efforts: good, better, best?***

Plaintiff does not argue that Defendants acted in bad faith, or even that their efforts lacked diligence. Instead, Plaintiff argues that Defendants did not use their best efforts - that they could have done more to obtain the variance or special use permit, and that the application that they made was not reasonably designed to garner the approval of the Barrington Zoning Board. Before the Court evaluates the quality of Defendants' exertions, it is necessary to come up with a workable standard by which to measure 'best efforts.'

In the Bradford Dyeing case, cited above, Bradford Dyeing agreed to obtain a permit from the state Department of Environmental Management prior to completing the purchase of a wastewater treatment system from a German manufacturer. In characterizing the nature of Bradford's duty, the Rhode Island Supreme Court wrote, "That obligation imposed upon Bradford its implied promise to Stog that Bradford would in good faith take all reasonable steps and make all reasonable effort to obtain the DEM order of approval." Bradford Dyeing, 765 A.2d at 1235.

The Sixth Circuit likewise indicated its preference for a standard based on reasonableness in Permanence Corp. v.

Kennametal, Inc.,

> While the phrase "best efforts" is often used to describe the extent of the implied undertaking, this has properly been termed an "extravagant" phrase. A more accurate description of the obligation owed would be the exercise of "due diligence" or "reasonable efforts."

908 F.2d 98, 100, n. 2 (6th Cir. 1990)(cites omitted).

In Macksey v. Egan, 633 N.E.2d 408, 413, n. 16 (Mass. App. Ct. 1994), the Appeals Court quoted the trial judge's jury instructions approvingly in a breach of contract case:

> The judge instructed: "'Best efforts' is what is reasonable under the circumstances. What constitutes best efforts my be determined by the parties' intentions. Best efforts does not require unreasonable, unwarranted or impractical efforts and expenditures of time and money out of all proportion to economic reality. Best efforts is equal to a good faith effort to meet one's obligations. The defendants are allowed to give reasonable consideration to their own interest. The defendants were required to do what was contemplated and what was reasonable under all of the circumstances, and to perform their activities with a good faith effort to the extent of their capabilities..."

The First Circuit stated in Triple-A Baseball Club v. Northeastern Baseball, 832 F.2d 214, 225 (1st Cir. 1987), that "the 'best efforts' standard has been held to be equivalent to that of good faith," and that the Court was unable to find a case in which a court had held that a party had acted in good faith, but had not employed its best efforts.

In light of these precedents, the Court is comfortable in concluding that a party's diligent, reasonable, good faith effort to fulfill the obligations imposed by the contract is good enough to qualify as 'best.'

With this standard in mind, the Court now reviews Defendants' efforts to obtain zoning relief on their Barrington property, with particular attention to the shortcomings cited by Plaintiff.

***The nature of the zoning application***

Plaintiff argues that the concept proposed to the Zoning Board was not one that was likely to be approved. In support of his argument, Plaintiff cites trial testimony of Danzell and his architect, Litman. Danzell's family had remained in South Carolina while he commuted back and forth to Providence during the time period in question. At trial, Danzell revealed that his family was ambivalent about the move to Barrington. He also indicated that the renovation plan that most appealed to him was to tear down the waterfront house and rebuild a new house on that site. Litman, who said various equivocal and contradictory things about the renovations, expressed that tearing down one house and adding on to the other house was probably the plan most likely to be approved by the Zoning Board. However, for reasons that were not fully developed at trial, neither of these concepts was ultimately presented to the Zoning Board. Instead, the

Zoning Board was presented with a proposal to leave one house as is, and add new construction to the other house to more than double its size. Moreover, the proposal was characterized by Litman as a "conceptual planning study with just footprint and massing" geared to "get approval on principle." [Trial transcript, May 2, 2007, p. 77, ll. 20-22].

The language of the Rider indicated that Defendants would seek permission from the Town to "remove the present house, building a new house and/or reconstructing the house with a new configuration." Whether the "house" referenced is number 10 or number 12 is not specified. Defendants were not bound by the Rider to favor one renovation option over another, and they were not bound to choose the option most likely to garner approval from the Zoning Board. The Rider provided them with flexibility to seek permission to proceed in any manner they chose. As long as the proposal presented to the Board was made in good faith, and was not purposefully designed to fail (as Plaintiff hints at but stops just short of making this argument), and as long as the proposal involves the type of renovations contemplated by the language of the Rider, then it reasonably fulfills Defendants' contractual obligations.

*__The quality of the zoning application__*

Plaintiff also argues that Defendants did not use best efforts in preparing the zoning application; that, basically, the

application presented to the Board was 'half-baked.' Plaintiff focuses specifically on Defendants' decision not to hire Litman's firm to prepare complete schematic designs of the proposed new construction prior to the zoning hearing. Plaintiff finds support for his argument in some of the comments made by the Zoning Board members at the time of the vote.

Litman outlined a proposed fee structure to Danzell in his letter of April 9, 2004. The fees included $3,200 for "As-Built Existing House Plans and Elevations," $1,500 for "1st Phase - Zoning Package," and $24,000 for "Schematic Design." Danzell authorized the first two items but instructed Litman to hold off on the schematic designs. Accordingly, the proposal presented to the Zoning Board included only four sketches or diagrams indicating the footprints and general outlines of the existing buildings and the proposed new construction. The proposal, characterized by Plaintiff in his post-trial memorandum as "an inexpensive shot in the dark," was insufficient to demonstrate to the Zoning Board that Defendants met the standards of the ordinance for nonconforming uses, and, therefore, were entitled to relief. Plaintiff attaches particular importance to the section of the ordinance that requires a showing that "the general visual appearance of the nonconforming use shall not be altered in a way so as to heighten or make more apparent its nonconformity..." Barrington Code, Article XIV, § 185-74 (B).

The transcript of the Zoning Board hearing reflects that Plaintiff's reactions to the omission of complete schematic designs were shared by some of the Board members. Neal Personeus stated, "...in this case the plans that were presented were, made it look like they were building an auditorium. We have no windows. There was no detail as to what this structure was going to look like. So as far as making the nonconformance worse than what it was, that would definitely be the case with the application presented." Chairman Brenner concurred, stating that when the proposal is to expand a non-conforming use, "[T]hat is crying out for specific plans as to what you're going to do. And without those specific plans I don't think that any application should be granted."

It is undeniable that the inclusion of full schematic designs (involving an additional expenditure of $24,000 for Defendants) would have made for a more thorough presentation to the Zoning Board. However, the Court concludes that Defendants' failure to include those designs did not represent a breach of the contract because it was reasonable for them to proceed as they did. In support of this conclusion, the Court notes the following facts from the trial record.

The Chairman of the Zoning Board, Jeffrey Brenner, testified that all zoning applications, including Defendants', were reviewed by the Town's Building Official at the time of

submission. Applications that are insufficient as to form and format are not accepted for review. The fact that Defendants' application passed through this first hurdle indicates that it was not inadequate *per se*.

To prepare their zoning submission, Defendants hired Jay Litman, a Newport architect with thirty years of experience. Litman testified that he had appeared before the Barrington Zoning Board two or three times previously. He described Defendants' application as "a conceptual planning study with just footprint and massing," and said he had had similar submissions approved in the past and that he expected Defendants' application would be approved.

In addition, Defendants hired Anthony DeSisto, an attorney with a practice concentration in zoning law. DeSisto testified that he had appeared in front of the Barrington Zoning Board in connection with applications for special use permits or other relief over 100 times. He believed that Defendants' application was sufficient because it met the Board's requirements and because it was similar to previous submissions he had made which were approved by the Board.

Finally, the official reasons cited by the Board for its decision do not include the insufficiency of the application. Instead, those reasons parrot the language of the ordinance: "A) that the public convenience and welfare will not be substantially

served; B) that it will not be in harmony with the general purpose of this ordinance and with the Comprehensive Community Plan; C) that it will not result in or create conditions that will be inimical to the public health, safety, morals and general welfare of the community; and D) that it will substantially or permanently injure the appropriate use of the property in the surrounding area or district."

Looking beyond this boilerplate language to the reasons expressed by the Board members during their discussions, it seems clear that their main objection to the proposal was that it was too big. The proposal would not only retain the two buildings, thereby perpetuating the non-conformity, but it was to more than double the size of one of the buildings. No detailed architectural drawings were required to determine that this plan would alter "the general visual appearance of the nonconforming use... so as to heighten or make more apparent its nonconformity." The so-called 'conceptual planning study with footprint and massing' was more than adequate to illustrate the "general visual appearance" of the proposed new structure. Finally, it is worth noting that there is no evidence to indicate that the inclusion of full schematic designs, and Defendants' additional expenditure of $24,000, would have resulted in approval of the application by the Zoning Board.

**Tender and the terms of the promissory note**

While the Court holds that Defendants exercised diligence and good faith and used reasonable efforts to fulfill their obligations under the Rider, the Court holds further that Defendants remain obligated to pay Plaintiff the portion of the purchase price that was not contingent on the variance application. According to paragraph 4 of the Rider, Defendants were to pay Plaintiff "$100,000 and 5% per annum interest on the full value of the note of $200,000 at the time of the denial." Consequently, Defendants owe $100,000 plus interest, calculated at the rate of 5% per annum on $200,000 from the closing, October 30, 2003, to the date of the denial of the variance, October 21, 2004.

Moreover, Defendants' failure to make payment at the time of the denial of the variance places them in default of the terms of the promissory note, according to its sixth paragraph, which specifies that interest will be calculated on the unpaid balance, at the time of default, at 12% per annum. Accordingly, the Court orders payment of interest on the unpaid balance of $100,000 from October 22, 2004 through January 31, 2005.

The Court has fixed January 31, 2005, as the termination point for the accrual of interest because it finds that Defendants made an attempt to tender payment at that time, and that this attempt was rejected by Plaintiff. Although the telephone conversation between DeSisto and Jacobi did not include

the literal 'counting out' of cash required in a formal tender offer, the Court finds that it was sufficient and adequate tender to stop the running of the interest clock. The fact that the money was in an escrow account indicated that Defendants were ready, willing and able to make the payment at that time. Moreover, because the law does not require one to perform a useless act, "formal tender is never required where by act or word the other party has shown that if made it would not be accepted." Strasbourger v. Leerburger, 233 N.Y. 55, 134 N.E. 834, 836 (N.Y. 1922); see also Hills v. National Albany Exchange Bank, 105 U.S. 319 (1882); Guthrie v. Curnutt, 417 F.2d 764 (10th Cir. 1969).

Because the burden is on the Defendants to establish tender, and DeSisto recalls only that the telephone call took place sometime in December 2004 or January 2005, the Court concludes that January 31, 2005, is an appropriate date to use as the time of tender.

**Conclusion**

For the reasons stated above, the Court decides this case in favor of Defendants on the issue presented. Defendants owe Plaintiff $100,000 plus interest, rather than $200,000 plus interest. The Clerk shall enter judgment for Plaintiff in accordance with the terms of the Rider and note as follows: The judgment will be in the amount of $100,000.00, plus 5% interest

per annum on the full value of the note, $200,000, calculated from the time of the closing, October 30, 2003, through October 21, 2004; plus interest of 12% per annum on $100,000 from October 22, 2004 through January 31, 2005. The Clerk shall make those calculations and enter judgment for Plaintiff against Defendants in that total amount.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
September 20, 2007